SHELDON EISENBERG (SBN 100626)
seisenberg@sullivantriggs.com
GILLIAN KUHLMANN (SBN 316241)
gkuhlmann@sullivantriggs.com
NAIRI SHIRINIAN (*admission pending*)
nshirinian@sullivantriggs.com
SULLIVAN & TRIGGS LLP
1230 Montana Avenue, Suite 201
Santa Monica, California 90403
Telephone: (310) 451-8300
Facsimile: (310) 451-8303

COURTNEY ELGART (*pro hac vice forthcoming*)
celgart@sullivantriggs.com
SULLIVAN & TRIGGS LLP
Washington, DC 20011

Attorneys for Plaintiffs,
ROBERT KIRKMAN, GALE ANNE HURD,
DAVID ALPERT, CHARLES EGLEE,
GLEN MAZZARA, ROBERT KIRKMAN,
LLC, VALHALLA ENTERTAINMENT,
INC., CIRCLE OF CONFUSION
PRODUCTIONS LLC, UNITED BONGO
DRUM, INC. and 44 STRONG
PRODUCTIONS, INC.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

| | |
|---|---|
| Robert Kirkman, an individual; Robert Kirkman LLC, a Kentucky limited liability company; Gale Anne Hurd, an individual; Valhalla Entertainment, Inc. f/k/a Valhalla Motion Pictures, Inc., a California corporation; David Alpert, an individual; Circle of Confusion Productions LLC, a California limited liability company; New Circle of Confusion Productions, Inc., a California corporation; Charles Eglee, an individual; United Bongo Drum, Inc., a California corporation; Glen Mazzara, an individual; and 44 Strong Productions, Inc., a California corporation, <br><br> Plaintiffs, <br><br> v. <br><br> AMC Film Holdings LLC, a Delaware limited liability corporation, <br><br> Defendant. | Case No. 2:21-cv-9068 <br><br> **COMPLAINT FOR DECLARATORY JUDGMENT AND PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF** |

Plaintiffs Robert Kirkman, Gale Anne Hurd, David Alpert, Charles Eglee, and Glen Mazzara, and their respective loan-out corporations, Robert Kirkman LLC; Valhalla Entertainment, Inc. f/k/a Valhalla Motion Pictures, Inc.; Circle of Confusion Productions LLC and New Circle of Confusion Productions, Inc.; United Bongo Drum, Inc.; and 44 Strong Productions, Inc. allege as follows:

## INTRODUCTION

1.       Defendant AMC Film Holdings LLC ("AMC Studio") has been litigating, and notably not seeking to arbitrate, claims that it grossly underpaid the talent responsible for its record-breaking hit—*The Walking Dead*—for eight years. Plaintiffs and another key behind the camera talent on the series, the series' former director Frank Darabont, filed four lawsuits against AMC on the matter, the first in 2013. Each of these lawsuits have claimed that AMC Studio failed to honor its agreement to pay contingent compensation (commonly known as "profit participations") for the plaintiffs' work on *The Walking Dead*. Specifically, these lawsuits allege that notwithstanding that *The Walking Dead* is the most successful television series in basic cable history and that it has made AMC billions of dollars, the creative talent responsible for that success has shared in relatively little of its financial reward as a result of the AMC media conglomerate's scheme to use its vertically integrated structure to engage in self-dealing that has deprived the profit participants of the benefit of AMC Studio's promise to pay contingent compensation.

2.       Until October 28, 2021, AMC Studio had never sought to arbitrate any claims arising out of or related to the various agreements with Plaintiffs or with Darabont. Instead, AMC Studio has issued hundreds of discovery requests and conducted dozens of depositions related to the contracts providing for, among other things, contingent compensation to the talent responsible for the unparalleled success of *The Walking Dead*. AMC Studio even participated in a bench trial to resolve some of these issues.

SULLIVAN & TRIGGS, LLP
ATTORNEYS AT LAW
SANTA MONICA

**COMPLAINT FOR DECLARATORY JUDGMENT AND PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF**

3.      For years then, AMC Studio and its affiliates have therefore reaped the benefits of litigating with Plaintiffs. For example, it secured an interlocutory ruling in Los Angeles County Superior Court that it was entitled to unilaterally define how Plaintiffs' contingent compensation was to be calculated and accounted for. Only after suffering setbacks in litigation, however, did AMC Studio turn to arbitration. First, in July 2021, AMC Studio paid $200 million to avoid trial in Darabont's New York lawsuit. Two weeks later, the California Superior Court ruled that Plaintiffs' claim against AMC Studio for breach of the implied covenant of good faith and fair dealing and a tort claim, along with its request for punitive damages, against its parent company could proceed to trial, over AMC's objection that such claims were inconsistent with the court's previous interlocutory ruling that AMC's counsel had already publicly characterized as AMC's "total victory" in the case.

4.      Apparently now unhappy with the results of litigation, on October 28, 2021, AMC Studio filed a demand for arbitration with JAMS in New York (the "Demand for Arbitration"). In the JAMS arbitration, AMC Studio seeks declaratory relief on the scope of AMC Studio's obligations regarding Plaintiffs' potential rights to contingent compensation under a "most favored nations" provision in their contracts based on AMC's settlement with Darabont. Besides AMC's obvious and years in the making waiver of any right to arbitrate claims related to Plaintiffs' entitlement to contingent compensation, the Demand for Arbitration is deeply flawed even if an arbitral forum were available here. It is premature given that Plaintiffs have not asserted any claims related to the settlement with Darabont, leaving no requisite case or controversy for seeking declaratory relief. Moreover, a New York Supreme Court order from the on-going litigation with Plaintiffs precludes the litigation of any claims between Plaintiffs and Defendant relating to *The Walking Dead* anywhere but California. As a result, AMC's Demand for Arbitration serves no apparent purpose except to preemptively and improperly open a second front of litigation across the

\ \ \

country while Plaintiffs are preparing for trial in Los Angeles Superior Court set for May 2, 2022.

5.     But AMC Studio's efforts to force Plaintiffs to arbitrate suffer from a far more fundamental flaw—as corroborated by AMC's own post-agreement conduct in pursuing litigation for years—<u>Plaintiffs never agreed to arbitrate any claims against AMC Studio</u>.

6.     Not one of Plaintiffs' contracts include an arbitration provision. Instead, those contracts specifically provide for litigation as the exclusive means for dispute resolution.

7.     Therefore, in filing the Demand for Arbitration, AMC Studio has cited an arbitration provision in a document it emailed to Plaintiffs a year after Plaintiffs signed their contracts. Plaintiffs never signed that document or otherwise agreed to be bound by it or the arbitration provision included therein.

8.     "One of the threads running through federal arbitration jurisprudence is the notion that 'arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'" *Textile Unlimited, Inc. v. A.BMH & Co.*, 240 F.3d 781, 786 (9th Cir. 2001). Because Plaintiffs have never waived their contractual rights to litigate their claims against AMC Studio nor agreed to binding arbitration, they ask this Court to declare they are not required to participate in arbitration or be bound by it and to enjoin the ongoing JAMS proceeding.

## **PARTIES**

I.     **Plaintiffs and Related Persons and Entities**

   **A. Plaintiffs**

9.     **Kirkman—**Plaintiff Robert Kirkman resides in Los Angeles County, California. Kirkman is a New York Times best-selling comic book writer and a television writer and producer. Kirkman created and continues to write the popular original comic book, "The Walking Dead," which won an Eisner Award for best

SULLIVAN & TRIGGS, LLP
ATTORNEYS AT LAW
SANTA MONICA

**COMPLAINT FOR DECLARATORY JUDGMENT AND PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF**

continuing series in 2010. "The Walking Dead" was adapted into the hugely successful television series of the same name and exploited to form the basis of several off shoots including *The Talking Dead* and *Fear The Walking Dead*. Kirkman is also an executive producer of *The Walking Dead*.

10.     Plaintiff Robert Kirkman LLC is a limited liability company organized and existing under the laws of Kentucky with its principal place of business in California. Robert Kirkman LLC furnishes the writing, producing, and related services of Robert Kirkman in connection with television projects, including his work on *The Walking Dead*. Robert Kirkman and Robert Kirkman LLC are collectively referred to herein as "Kirkman."

11.     **Hurd**—Plaintiff Gale Anne Hurd resides in Los Angeles County, California. She is an American film and television producer and has produced multiple Academy and Emmy Award winning films and series. She has served as an executive producer of *The Walking Dead* since the series' inception.

12.     Plaintiff Valhalla Entertainment, Inc. (f/k/a Valhalla Motion Pictures, Inc.) is a corporation organized and existing under the laws of California with its principal place of business also in California. Valhalla furnishes the producing and related services of Gale Anne Hurd in connection with film and television projects, including her work on *The Walking Dead*. Gale Anne Hurd and Valhalla are collectively referred to herein as "Hurd."

13.     **Alpert**—Plaintiff David Alpert resides in Los Angeles County, California. He is an American television producer and the longtime manager and business partner of Robert Kirkman. He has served as an executive producer of *The Walking Dead* since its inception.

14.     Plaintiff Circle of Confusion Productions LLC is a limited liability company organized and existing under the laws of California with its principal place of business also in California. Circle of Confusion Productions furnishes the

\ \ \

producing and related services of David Alpert in connection with television projects, including his work on *The Walking Dead*.

15.     Plaintiff New Circle of Confusion Productions, Inc. is a corporation organized and existing under the laws of California with its principal place of business also in California. New Circle of Confusion Productions, Inc. furnishes the producing and related services of David Alpert in connection with television projects and is the successor-in-interest to Circle of Confusion Productions LLC with respect to Alpert's executive producer services for *Fear The Walking Dead*. David Alpert, Circle of Confusion Productions LLC, and New Circle of Confusion Productions, Inc. are collectively referred to herein as "Alpert."

16.     **Eglee**—Plaintiff Charles Eglee resides in Los Angeles County, California. In addition to numerous industry award nominations, Eglee earned an Emmy Award for his work on NYPD Blue and a Peabody Award for his work on The Shield. Eglee served as a writer and executive producer of *The Walking Dead* during its highly successful first season.

17.     Plaintiff United Bongo Drum, Inc. is a corporation organized and existing under the laws of California with its principal place of business also in California. United Bongo Drum furnishes the writing, producing, and related services of Charles Eglee in connection with television projects, including his work on *The Walking Dead*. Charles Eglee and United Bongo Drum are collectively referred to herein as "Eglee."

18.     **Mazzara**—Plaintiff Glen Mazzara resides in Los Angeles County, California. He is an American film and television producer and writer. He served as a writer for *The Walking Dead* during 2010 and served as executive producer and showrunner of *The Walking Dead* between 2011 and 2012.

19.     Plaintiff 44 Strong Productions, Inc. is a corporation organized and existing under the laws of California with its principal place of business also in California. 44 Strong furnishes the writing, producing, and related services of Glen

**COMPLAINT FOR DECLARATORY JUDGMENT AND PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF**

Mazzara in connection with film and television projects, including his work on *The Walking Dead*. Glen Mazzara and 44 Strong are collectively referred to herein as "Mazzara."

## II.   Defendants and Related Person and Entities

### A.   Named Defendants

20.   **AMC Studio**—Defendant AMC Film Holdings LLC is a limited liability corporation organized and existing under the laws of Delaware with its principal place of business in New York. AMC Film Holdings LLC is referred to throughout as "AMC Studios." AMC Studios is a directly or indirectly owned subsidiary or affiliate of related parties AMC Parent and AMC Network (both defined below) and is the successor-in-interest to Plaintiffs' contracts with the AMC corporate family.

### B.   Related Persons and Entities

21.   **AMC Parent**—AMC Networks, Inc. is a vertically integrated media conglomerate with dozens of indirectly and directly owned subsidiaries including AMC Studio and AMC Network Entertainment LLC. AMC Networks, Inc. is referred to throughout as "AMC Parent." AMC Parent is a publicly owned corporation organized and existing under the laws of Delaware with its principal place of business in the New York.

22.   **AMC Network**—AMC Network Entertainment LLC is a limited liability corporation organized and existing under the laws of Delaware with its principal place of business in New York. AMC Network was formerly known as "American Movie Classics Company LLC." AMC Network exhibits television programming, including *The Walking Dead*. AMC Network is the original signatory to Plaintiff Robert Kirkman's initial contract for *The Walking Dead*.

23.   **Stu Segall**—Stu Segall Productions, Inc. is a production service company. TWD Productions LLC, an AMC subsidiary, hired Stu Segall Productions, Inc. to provide production services for *The Walking Dead*. Specifically, AMC

Network, then operating as American Movie Classics Company LLC, and TWD Productions LLC contracted with Stu Segall Productions, Inc. to secure top talent, including Plaintiffs, to create the series. Accordingly, Stu Segall Productions is the original signatory to several of Plaintiffs' agreements including the initial deals for Gale Anne Hurd, David Alpert, Chic Eglee, and Glen Mazzara. Stu Segall Productions later assigned those contracts to TWD Productions and TWD Productions then assigned the contracts to AMC Studio.

## III.    Other Related Persons

24.    **Darabont**—Frank Darabont developed *The Walking Dead* for AMC, wrote and directed the pilot episode, and served as an executive producer and showrunner during its first season. Ferenc, Inc. and Darkwoods Productions, Inc., both corporations organized and existing under the laws of California with their principal place of business in California, are Darabont's loan out corporations. Frank Darabont, Ferenc, and Darkwoods are collectively referred to herein as "Darabont."

25.    **CAA**—Creative Artists Agency, LLC is a Delaware limited liability company with its principal place of business located in Los Angeles County, California. CAA is a leading talent and sports agencies. CAA served as Darabont's talent agent in negotiating a deal with AMC to create *The Walking Dead.*

26.    **The *Darabont* Litigation and Settlement**—Darabont and CAA together have or had a right to contingent compensation from the proceeds generated by *The Walking Dead*. They brought their own cases related to contingent compensation against AMC Studio and various AMC affiliates in New York state court in 2013 and again in 2018. According to SEC reports, on July 16, 2021, AMC settled Darabont's and CAA's lawsuits "for a cash payment of $200 million" and "future revenue sharing related to certain future streaming exhibition of *The Walking Dead* and *Fear The Walking Dead*."

\ \ \

\ \ \

## JURISDICTION AND VENUE

27.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1332 and 2201(a).

28.     This action is between citizens of different states. The amount in controversy exceeds $75,000 exclusive of interest and costs.

29.     This Court has personal jurisdiction over AMC Studio because AMC Studio has consented to jurisdiction in California for "any claims or causes of action related to *The Walking Dead.*"

30.     The Court also has personal jurisdiction over AMC Studio because AMC Studio conducts significant business related to the underlying actions, issues, and claims in the case.

31.     Venue is proper in the Central District of California because AMC Studio consented to venue in California and because the underlying contracts at issue were negotiated and signed in California, with California entities on both sides of Hurd's, Alpert's, Mazzara's, and Eglee's contracts. AMC Studio also does substantial business in the Central District of California.

## GENERAL ALLEGATIONS

**IV.    The parties sign contracts governing contingent compensation that expressly provide for a judicial forum for dispute resolution.**

32.     Plaintiff Robert Kirkman, Plaintiff Gale Anne Hurd, and Frank Darabont began discussing a television series based on "The Walking Dead" with AMC in early 2009. Robert Kirkman signed his contract, a "Literary Option Purchase Agreement," with AMC Network on November 30, 2009.

33.     Hurd's negotiations spilled into 2010: she closed her initial deal with AMC in June 2010. Plaintiff David Alpert and Plaintiff Chic Eglee each signed their initial agreements with AMC in July 2010.

34.     In each of their contracts, AMC agreed to pay Kirkman, Hurd, Alpert, and Eglee contingent compensation for their work on *The Walking Dead*. Typically,

only the top talent in the cast or crew will have the right to receive contingent compensation and those rights provide for a certain percentage of contractually defined "profits," in this case denominated as modified adjusted gross receipts ("MAGR"). MAGR is an industry term that refers to a type of formula for calculating contingent compensation, i.e. a defined pool of distribution and licensing revenue minus a defined measure of production and distribution costs, various fees, and other charges.

35.     In his contract dated November 30, 2009, AMC agreed to pay Kirkman 2.5% of 100% of MAGR in exchange for Kirkman granting AMC the rights to exploit "The Walking Dead" graphic novel to create a television series. Ex. 1 § 11.a. Those rights vested in 2010 when Kirkman satisfied certain contingencies, primarily proving chain of title. Ex. 1 § 11.c.

36.     AMC also agreed to pay Kirkman another 2.5% of 100% of MAGR in exchange for Kirkman providing executive producer services. Ex. 1 § 11.a. Hurd's, Alpert's, and Eglee's contingent compensation was also tied to their executive producer services. Ex. 2 § 4.a, Ex. 3 § 4.a, Ex. 4 § 7.a. AMC agreed to pay Hurd 7.5% of 100% of MAGR, Alpert 2.5% of 100%, and Eglee up to 4.75% of 100%. Ex. 2 § 4.a, Ex. 3 § 4.a, Ex. 4 § 7.a. Each of these MAGR interests vested one-quarter at a time, with the first three-quarters vesting by the end of the first season in 2010 and the last .625% vesting at the conclusion of the second season. Ex. 1 § 11.c, Ex. 2 § 4.c, Ex. 3 § 4.c, Ex. 4 § 7.b.

37.     Ultimately, Kirkman's 5%, Hurd's 7.5%, Alpert's 2.5%, and 2.375% of Eglee's MAGR interests vested. Eglee left the series in December 2010 and in the contract memorializing his departure, AMC agreed that Eglee's 2.375% had vested.

38.     Each of their contracts provided that MAGR would be computed by a MAGR definition tied to the entity that financed and produced the show. When AMC decided to self-produce *The Walking Dead*, this meant that AMC was responsible for proposing a MAGR definition. Ex. 1 § 11.b, Ex. 2 § 4.d, Ex. 3 § 4.d, Ex. 4 § 7.c.

SULLIVAN & TRIGGS, LLP
ATTORNEYS AT LAW
SANTA MONICA

39. Each of their contracts also included most favored nation or "MFN" clauses that guaranteed them that their profit participation would be computed no less favorably than certain other designated persons. Ex. 1 § 11.b, Ex. 2 § 4.d, Ex. 3 § 4.d, Ex. 4 § 7.c.

40. Relevant here, Kirkman's, Hurd's, Alpert's, and Eglee's MFNs guaranteed them that their contingent compensation would not be computed on a basis less favorable than Frank Darabont's.

41. Each of their contracts were also included integration clauses that provide that the agreements can only be modified by a signed writing. Ex 1 § 23, Ex. 2 § 12.e, Ex. 3 § 13.e, Ex. 4 § 9.e.

42. There is not a word in any of these contracts about arbitration. Instead, Kirkman's, Hurd's, Alpert's, and Eglee's contracts specify that disputes are to be settled with an action at law for money damages. Ex. 1 at Schedule I § 9.c, Ex. 2 at Exhibit A § 9.b, Ex. 3 at Exhibit A § 9.b, Ex. 4 at Exhibit A § 10.b. And they include judicial forum selection clauses designating the state and federal courts of New York as the appropriate venue for any litigation over the agreements. Ex. 1 at Schedule I § 32 ("EACH PARTY HEREBY CONSENTS TO THE JURISDICTION OF ANY STATE OR FEDERAL COURT LOCATED IN THE STATE OF NEW YORK."), Ex. 2 § 12.g ("EACH PARTY HEREBY CONSENTS TO THE EXCLUSIVE JURISDICTION OF ANY STATE OR FEDERAL COURT LOCATED IN THE STATE OF NEW YORK"), Ex. 3 § 13.g ("EACH PARTY HEREBY CONSENTS TO THE EXCLUSIVE JURISDICTION OF ANY STATE OR FEDERAL COURT LOCATED IN THE STATE OF NEW YORK"), Ex. 4 § 9.g ("EACH PARTY HEREBY CONSENTS TO THE EXCLUSIVE JURISDICTION OF ANY STATE OR FEDERAL COURT LOCATED IN THE STATE OF NEW YORK"). In the case of Hurd, Alpert, and Eglee, their original contracts created exclusive jurisdiction in New York state and federal courts. Ex. 2 § 12.g, Ex. 3 § 13.g, Ex. 4 § 9.g. There is also nothing in the parties' agreement that vest AMC Studio with any kind of

discretion to unilaterally amend these dispute resolution provisions with a mandatory arbitration requirement.

43.    None of the Plaintiffs or their representatives ever discussed binding arbitration with AMC Studio, AMC Network, AMC Parent, AMC's counsel, Stu Segall Productions, or any other person affiliated with AMC when negotiating their contracts.

44.    None of them or their representatives were provided with a MAGR definition from AMC while negotiating their contacts nor were told that the MAGR definition would include a binding arbitration provision.

45.    In fact, AMC's MAGR definition did not even exist when their contracts were negotiated because *The Walking Dead* was the first series AMC ever self-financed and produced.

46.    And neither Kirkman, nor Hurd, nor Alpert, nor Eglee ever agreed, in any context, to arbitration as the means to resolve disputes.

**V.    A year later, AMC issues a contingent compensation definition that includes an arbitration provision.**

47.    The first season of *The Walking Dead* premiered on AMC Network on Halloween in 2010. The six-episode season concluded on December 5, 2010.

48.    This first season was hugely successful. The premiere was the most watched in AMC Network history and the highest rated in all of cable in 2010. Before the first season even concluded, AMC renewed and began work on the series for a second season. The press release announcing AMC's decision, titled "AMC Resurrects *The Walking Dead* for a Second Season: BIGGEST SERIES DEBUT IN CABLE HISTORY AMONG ADULTS 18-49," disclosed that AMC had already closed a deal for international distribution of the second season.

49.    AMC waited until after the conclusion of the hugely successful first season of *The Walking Dead* to distribute a MAGR definition.

\ \ \

50.     Accordingly, on March 16, 2011, AMC sent a MAGR definition to Kirkman's representatives. AMC sent the same MAGR definition to Hurd on March 10, to Alpert on March 15, and to Eglee on March 17.

51.     That MAGR definition defines what revenues, production costs, distribution fees and costs, overhead charges, and interest charges AMC would include when calculating Plaintiffs' entitlement to contingent compensation.

52.     The MAGR definition also has a "Miscellaneous Provision[]," having nothing to do with the calculation of or accounting for contingent compensation, that purports to require binding arbitration to resolve "[a]ny and all controversies, claims or disputes arising out of or relating to this [MAGR definition], or the enforcement, arbitrability, interpretation, performance or breach thereof, including, but not limited to, alleged violations of state or federal statutory or common law rights or duties." Ex. 7 § III.F.

53.     Plaintiffs never signed off or agreed to the after-the-fact MAGR definition and certainly never agreed to amend their underlying agreements with AMC to waive their rights to a jury trial and adopt its arbitration provision.

## VI.    Glen Mazzara signs his deal for *The Walking Dead* and AMC subsequently attempts to unilaterally impose arbitration.

54.     On February 2, 2011, Glen Mazzara signed his initial contract to provide executive producer services on *The Walking Dead*. Ex. 5. This initial contract did not include any contingent compensation or an arbitration clause. Instead, it allows him to bring "an action at law" to recover money damages in the event of any dispute. Ex. 5 § 17.

55.     Mazzara left the series in December 2012. In the agreement memorializing Mazzara's departure, AMC agreed to pay Mazzara 1.5% of 100% of MAGR for *The Walking Dead*. Ex. 6 § 3.b.

56.     Mazzara's MAGR rights vested immediately. *See* Ex. 6 § 3.b.

\ \ \

57. The agreement also specified that Mazzara's MAGR participation would be "defined, calculated, or accounted for" as favorably as "any other individual rendering services on" *The Walking Dead*. Ex. 6 § 3.b.

58. Neither of Mazzara's contracts authorize binding arbitration.

59. Mazzara and his representatives never discussed arbitration with AMC.

60. Mazzara and his representatives were not provided a MAGR definition before signing his contract with AMC, and he was not informed that the MAGR definition would include an arbitration clause

61. AMC sent Mazzara the MAGR definition in May 2014.

62. Mazzara never signed the MAGR definition or otherwise agreed to amend his underlying deals with AMC to waive his rights to a jury trial and adopt its arbitration provisions.

63. At the same time AMC circulated a MAGR definition to Mazzara for the first time, it modified the MAGR definition given to Plaintiffs purportedly to honor Plaintiffs' MFN rights after agreeing to modify that definition for another profit participant. AMC then updated the MAGR definition again in January 2015 purportedly to reflect both changes it made for another profit participant and to reflect "global changes AMC has made to its definition." AMC made these global changes without consulting Plaintiffs about the propriety of doing so. AMC amended the MAGR definition a third time in 2018 to reflect another purported MFN improvement.

## VII. AMC litigates their obligations under the underlying agreements providing for contingent compensation for eight years.

64. **The *Darabont* Litigation**—Frank Darabont sued AMC Studio and related corporations for violating its obligations related to contingent compensation in New York state court in December 2013. Darabont brought a second case in New York state court in January 2018. Although Darabont was the recipient of the same MAGR definition unilaterally issued to Plaintiffs, AMC Studio never sought

Case 2:21-cv-09068-PA-KS   Document 1   Filed 11/18/21   Page 15 of 21   Page ID #:15

arbitration of these claims. Instead, AMC Studio engaged in extensive discovery and motions practice through July 2021, when it ultimately settled the *Darabont* litigation.

65.     **The California Litigation**—On August 14, 2017, Kirkman, Mazzara, and Hurd filed suit in Los Angeles County. Kirkman and Mazzara brought claims related to their various rights to profit participation for *The Walking Dead* and its spin-off *Fear the Walking Dead*. The complaint alleged, among other things, that AMC breached the underlying contracts and the implied covenant of good faith and fair dealing in how it accounted for Hurd's, Kirkman's, and Alpert's profit participation including by underpaying them and by engaging in self-dealing. The primary allegation in that case is that AMC Studio breached their contracts by setting, at the direction of its corporate parent, the license fee for the domestic airing of the series on AMC Network so low that it guaranteed AMC would never have to pay out meaningful contingent compensation, and thereby save hundreds of millions of dollars that would otherwise have been payable to Plaintiffs.

66.     **The New York Litigation**—The next day, on August 15, 2017, Hurd, Alpert, and Eglee sued in New York state court related to their rights to profit participation for *The Walking Dead* and its spin-off *Fear the Walking Dead*. The complaint alleged, among other things, that AMC breached their contracts and the implied covenant of good faith and fair dealing with how it accounted Hurd's, Alpert's, and Eglee's profit participation including by underpaying them and by engaging in self-dealing. Hurd, Alpert, and Eglee filed separately in New York because of the forum selection clauses in their contracts.

67.     Neither AMC Studio nor any of its co-defendants in those cases ever sought arbitration for the New York litigation or the California litigation.

68.     Instead, on October 23, 2017, AMC Studio, its co-defendants, and Hurd, Alpert, and Eglee reached an agreement to consolidate the New York and California actions into a single proceeding in California. To implement that agreement, the

SULLIVAN & TRIGGS, LLP
ATTORNEYS AT LAW
SANTA MONICA

15

**COMPLAINT FOR DECLARATORY JUDGMENT AND PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF**

parties filed a stipulation in the New York litigation seeking dismissal of that action without prejudice. As part of that stipulation, AMC waived any objection to venue or jurisdiction in California for the claims in the New York litigation. Ex. 8 ¶ 3.

69.     In that same stipulation, AMC and Hurd, Alpert, and Eglee also agreed and became bound by court order to litigate any future claims related to *The Walking Dead* or its spin-offs in California. Specifically, the stipulation states:

> If the Court "so orders" this Stipulation, **Plaintiffs shall not bring any claims or causes of action related to *The Walking Dead*, *Fear the Walking Dead*, *The Talking Dead* or any other derivative program of them, in New York, and will only bring such claims or causes of action in California.** In return, each of the Defendants waives any objection or defense, whether based in contract, state, common law or otherwise, that the CA Action is not an appropriate or convenient forum for the adjudication of all such claims whether asserted in the CA Action or in a subsequent California Action. Ex. 8 ¶ 8 (emphasis added).

The Court "so ordered" the stipulation on October 27, 2017. Ex. 8 at 6.

70.     AMC proceeded to vigorously defend the case in California. AMC Studio has issued 71 requests for admission, 151 requests for production, and 247 special interrogatories to Plaintiffs. AMC Studio has also taken 10 depositions of Plaintiffs and their transactional counsel and talent agents. This discovery has focused, in significant part, on the interpretation and enforceability of the MAGR definition and the underlying contracts—a topic that would be of central importance in a lawsuit or arbitration dealing with any MFN rights—and AMC Studio has even taken discovery by deposition specifically on the MFN rights that AMC alleges are at issue in the JAMS arbitration.

71.     Indeed, AMC Studio participated in an eight-day bench trial on contract interpretation issues where it cross-examined Plaintiffs and their representatives. At the so-called mini-trial, the parties litigated how to interpret Plaintiffs' contracts and whether AMC had the right to unilaterally define how MAGR would be calculated. The California Superior Court held that "AMC's MAGR definition 'shall' govern the calculation of MAGR." The mini-trial did not involve or address the enforceability of the arbitration provisions in the MAGR definition, and the Superior Court's ruling

**COMPLAINT FOR DECLARATORY JUDGMENT AND PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF**

did not adjudicate the enforceability of, or even mention, the arbitration provision. AMC Studio's counsel boasted that this ruling was "a total victory for AMC in a profit participation case over the _Walking Dead_ television franchise, knocking out hundreds of millions of dollars in alleged liability."

72.   AMC Studio also actively litigated the _Darabont_ case, conducting extensive written and deposition discovery through July 2021 when it settled that case.

73.   As soon as the _Darabont_ settlement was reported in AMC Parent's SEC filings, Plaintiffs issued a request for production for the settlement agreement in the California litigation. AMC Studio and its co-defendants refused to produce the settlement agreement. As a way to resolve that discovery dispute, Plaintiffs and AMC Studio stipulated that Plaintiffs would drop their request for the settlement agreement in exchange for AMC Studio's agreement that Plaintiffs were not required to pursue any MFN claims based on the Darabont settlement in the pending California litigation.

74.   To date, Plaintiffs have not pursued or even asserted any claim based on any MFN rights that may exist as a result of the _Darabont_ settlement. Indeed, Plaintiffs have not even seen the documentation of the _Darabont_ settlement to ascertain whether they might have such a claim—a fact that AMC's Demand for Arbitration plainly concedes. Moreover, Plaintiffs have not received the profit participation statement that would reflect whether AMC was going to honor their MFN rights, if any, related to the settlement, the issuance of which is a contractual predicate for asserting any such claim.

**VIII.  Only after losing a key ruling, AMC turns to arbitration.**

75.   Two weeks after settling the _Darabont_ litigation, AMC's litigation fortunes reversed. On July 27, 2021, the court denied AMC Studio's demurrer and motion to strike Plaintiffs' alternative implied covenant of good faith claims and a tort claim seeking punitive damages against AMC Parent. In doing so, the court

permitted Plaintiffs to proceed to trial on a claim seeking hundreds of millions of dollars in damages. *See* Eriq Gardner, *Robert Kirkman's 'Walking Dead' Lawsuit Rises Up Once Again*, The Hollywood Reporter (July 27, 2021), available at https://www.hollywoodreporter.com/business/business-news/robert-kirkman-walking-dead-lawsuit-1234989000/.

76.   Only after suffering this setback in litigation, AMC Studio turned to arbitration.

77.   Specifically, on October 28, 2021, AMC Studio filed a demand for arbitration naming Plaintiffs as Respondents with JAMS' New York City office.

78.   Even though Plaintiffs have not asserted or threatened to assert any claims based on MFN rights against AMC Studio related to the *Darabont* settlement, AMC Studio has requested a declaratory judgment that Plaintiffs MFN rights do not apply to AMC's settlement with Frank Darabont. And even though AMC Studio agreed, and the New York Supreme Court ordered Plaintiffs, to resolve all future claims in California, AMC filed the Demand for Arbitration in New York.

79.   The JAMS arbitration is identified as JAMS case no. 1425036457.

80.   Immediately upon receiving the Demand for Arbitration, Plaintiffs notified JAMS that they are not subject to, and will object to, JAMS' jurisdiction.

81.    JAMS is nonetheless proceeding with administering the arbitration. On November 15, 2021, JAMS sent a "Commencement of Arbitration" package to Plaintiffs and AMC Studio. JAMS has set a deadline of November 22, 2021 to provide input on its proposed panel of potential New York-based arbitrators, a deadline to which Plaintiffs have objected and requested an extension to permit the Court to determine whether Plaintiffs are subject to AMC's Demand for Arbitration.

\ \ \

\ \ \

\ \ \

# CAUSES OF ACTION

### First Cause of Action – Declaratory Judgment Act
(By All Plaintiffs against AMC Studio)

82.     Plaintiffs repeat, reallege, and incorporate all other paragraphs as if fully set forth herein.

83.     Plaintiffs are entitled to declaratory judgment under 28 U.S.C. § 2201 that they did not agree to arbitrate any disputes with AMC, including, but not limited to, the subject matter of the Demand for Arbitration; that requiring Plaintiffs to participate in the arbitration would be contrary to the New York Supreme Court's October 27, 2017 order; that Plaintiffs are not subject to JAMS's jurisdiction with regards to any disputes, including, but not limited to, the subject matter of the Demand for Arbitration; and that Plaintiffs therefore are not obligated to participate in the JAMS arbitration nor bound by its outcome.

84.     An actual controversy exists between Plaintiffs and AMC regarding whether Plaintiffs are required to submit to the JAMS arbitration.

85.     A declaratory judgment is necessary because the JAMS arbitration is ongoing and because Plaintiffs maintain that they are not required to arbitrate while AMC contends that they are.

### Second Cause of Action – Injunctive Relief
(By All Plaintiffs against AMC Studio)

86.     Plaintiffs repeat, reallege, and incorporate all other paragraphs as if fully set forth herein.

87.     Plaintiffs are entitled to a preliminary and permanent injunction enjoining AMC Studio from pursuing the JAMS arbitration under 9 U.S.C. § 1 and Federal Rule of Civil Procedure 65 because:

  a. Plaintiffs have never agreed to submit to binding arbitration to resolve any claims against or involving AMC Studio;

**COMPLAINT FOR DECLARATORY JUDGMENT AND PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF**

b. Even if AMC Studio could unilaterally impose binding arbitration for certain claims relating to the MAGR definition, it was not authorized to unilaterally impose binding arbitration for claims flowing from Plaintiffs' underlying contracts with AMC;

c. The arbitration clause in the MAGR definition does not cover claims, if any, based on the MFN provisions in Plaintiffs' agreements;

d. AMC Studio waived any right to arbitrate claims related to Plaintiffs' contingent compensation for *The Walking Dead* by actively litigating substantially related claims and taking substantial discovery on the same;

e. AMC Studio waived any right to arbitrate claims by and against Plaintiffs related to their contingent compensation for *The Walking Dead* in New York by stipulating and obtaining an order that an action in California is the required venue for "any claims or causes of action related to *The Walking Dead*."

88.    Plaintiffs will suffer irreparable harm if it is compelled to submit to the JAMS arbitration because, among other reasons, they did not agree to arbitrate. *See Morgan Stanley v. Couch*, 659 F. App'x 402, 406 (2016) (collecting cases). In addition, requiring Plaintiffs to participate in the JAMS arbitration in New York would force Plaintiffs to violate the New York Supreme Court's October 27, 2017 order forbidding Plaintiffs from asserting any claims related to The Walking Dead series anywhere but in California. That harm to Plaintiffs will outweigh any harm to AMC Studio by the issuance of injunctive relief. And an order enjoining the arbitration will be in the public interest.

\ \ \

\ \ \

\ \ \

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against AMC Studio as follows:

    a.  For a declaration that Plaintiffs are not required to participate in the JAMS arbitration and cannot be bound by the outcome of the proceeding;

    b.  That AMC Studio, its representatives, and its successors and assignees, be enjoined from pursuing the JAMS arbitration;

    c.  That Plaintiffs be granted its reasonable attorneys' fees and costs; and

    d.  For such other and further relief as this Court may deem just and proper.

Dated: November 18, 2021        SULLIVAN & TRIGGS LLP

                       By:  /s/ Sheldon Eisenberg
                           Sheldon Eisenberg
                           Courtney Elgart
                           Gillian Kuhlmann
                           Nairi Shirinian

                           Attorney for Plaintiffs